**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
----------------------------------------------------------------x
In re                                              :
                                                   :        **Chapter 11**
**AGENT PROVOCATEUR, INC.,** *et al.,*[1]           :        **Case No. 17-10987**
                                                   :        **Joint Administration Requested**
                                                   :
                    Debtors.                        :
----------------------------------------------------------------x

---

### DECLARATION OF AMANDA BROOKS PURSUANT TO RULE 1007-2 OF THE LOCAL BANKRUPTCY RULES FOR THE SOUTHERN DISTRICT OF NEW YORK

I, Amanda Brooks, hereby declare (the "Declaration") as follows:

1.      I am Global Retail Director for Agent Provocateur, Inc. and its affiliated debtor Agent Provocateur, LLC (each a "Debtor" and collectively, the "Debtors").  I am authorized to submit this Declaration on behalf of the Debtors.

2.      On this date (the "Petition Date"), the Debtors commenced voluntary cases in this court (the "Court") under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").

3.      As described in greater detail below, the Debtors operate retail shops in New York and other areas of the country selling women's lingerie.  My duties include responsibility for overseeing the daily operations of the Debtors, and I am familiar with the Debtors' business affairs and books and records.

4.      This Declaration is submitted pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York (the "Local Rules") in connection with the

---

[1] The Debtors in these two chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are Agent Provocateur, Inc. (9441) and Agent Provocateur, LLC (0862).

voluntary chapter 11 petitions and first day motions filed in the above-captioned chapter 11 cases, and to provide the Court and interested parties with an overview of the facts and circumstances leading to this bankruptcy filing, as well as the steps taken to preserve the business going forward.  It is also submitted for the purpose of providing support for the motions and pleadings that the Debtors have filed with the Court, including various first day motions (the "First Day Motions").  Any capitalized term not expressly defined herein shall have the meaning ascribed to that term in the relevant First Day Motion.

5.      I am familiar with the Debtors' day-to-day operations and business and financial affairs, and the circumstances leading to the commencement of these chapter 11 cases.  Except as otherwise indicated herein, the facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, information provided to me by others, including by employees and by proposed counsel and financial advisors to the Debtors, or upon my opinion based upon my experience, knowledge, and information concerning the Debtors' operations and the retail lingerie industry, in general.  If I were called upon to testify, I could and would testify competently to the facts set forth herein, and I am authorized to submit this Declaration on behalf of the Debtors.

6.      Part I of this Declaration describes the Debtors' businesses and the relevant background preceding the filing of their chapter 11 petitions.  Part II sets forth the relevant facts in support of certain pleadings filed or to be filed by the Debtors concurrently herewith. Part III identifies the attached schedules of information required by Local Rule 1007-2.

## PART I

## CONCISE STATEMENT OF EVENTS LEADING TO CHAPTER 11 FILING

### *The UK Administration of Agent Provocateur, Ltd.*

7.      Debtor Agent Provocateur, Inc. was incorporated in 2000 as a California corporation with stores located in New York, California, and other parts of the country.  Debtor Agent Provocateur, LLC was formed in 2004 as a Delaware limited liability company with stores in Nevada.  The Debtors were formed in the United States for the purpose of operating U.S. retail outlets for merchandise supplied by their then parent in the United Kingdom, Agent Provocateur, Limited.

8.      Prior to the Petition Date, the Debtors' parent company in the United Kingdom, Agent Provocateur Limited (the "Parent"), was placed into administration under the insolvency laws of the United Kingdom.   A number of years before the commencement of the UK administration, in November 2007, funds managed by 3i Investments plc ("3i") acquired a majority stake in the Parent.[2]  During the years following the acquisition, the Parent expanded its international business by opening stores and incorporating additional subsidiary companies in various international locations.

9.      Also prior to the Petition Date, in August 2016, certain accounting irregularities were discovered, after which it became apparent that the Parent required significant additional capital to fund future operations.  In an effort to restructure, the Parent entered into a standstill agreement in October of last year with its secured lender, Barclays Bank PLC, to allow it a period of time to complete a restructuring, a refinancing, and/or sale.

10.      In connection with these efforts, Rothschild & Co. was retained on December 15,

---

[2] The Parent was the entity within the wider Agent Provocateur group that, among other things, provided head office services, entered into contracts with key suppliers of stock, and arranged for the delivery of such inventory to other subsidiaries within the group.

2016 to identify prospective buyers and/or investors in respect of the Parent.  The marketing process continued over a period of two months, culminating on February 16, 2017 with the submission of a number of offers from prospective purchasers.  Each of these offers was an offer to purchase assets (as opposed to equity interests in the Parent), and none of them provided sufficient consideration to satisfy all liabilities in full.  As a result, a sale was necessitated by way of a pre-packaged administration under insolvency laws of the United Kingdom.

11.     In order to consummate the transaction, on March 1, 2017, the Parent selected Alix Partners as joint administrator (the "UK Administrator").  Immediately following its appointment, on March 2, 2017, the UK Administrator completed a sale of the Parent's business and assets to a company within the Four Marketing Group.  My understanding is that the sale included all right, title and interest the Parent had in inventory (wherever located) and intellectual property (including the Agent Provocateur brand) relating to the Parent's business. The sale did not, however, include any of the Parent's subsidiaries, including the Debtors herein.[3]

12.     Prior to the sale, the Parent had provided the intellectual property, including the Agent Provocateur trademarks, to the U.S. companies (*i.e.,* the Debtors).   Up until that time, the U.S. companies also had relied on their Parent to supply inventory for sale in their stores, which obviously is the lifeblood of the Debtors' business operations.

13.     Following the sale, the Parent remains under the control of the Administrator, and Four Marketing Group—through its affiliated entities, Agent Provocateur IP Limited and Agent Provocateur Limited—has continued to operate the Agent Provocateur UK business.

---

[3] Since the consummation of the sale on March 2, 2017, I have provided transition services to the purchaser of the Parent's business and have received compensation in connection therewith.  It is anticipated that this arrangement will be terminated no later than May 31, 2017.

### *The Debtors' Operations Following the Sale of Their Former Parent*

14.     Following the sale of the Parent's operating assets, and the subsequent administration of the Parent, the U.S. companies (*i.e.*, the Debtors) were left utterly stranded, and were about to shut down.  The primary reasons for this are twofold:  (1) the U.S. entities could no longer rely upon the use of the former Parent's intellectual property; and (2) more importantly, they no longer had a source of merchandise to place on their store shelves and sell to customers.

15.     Accordingly, without a license to use intellectual property, and with no continuing supply of inventory, the Debtors were left with no further ability to maintain viable operations on a going forward basis, and they were on the verge of a complete and immediate shutdown.  As they were about to shut down and file petitions under Chapter 7 of the Bankruptcy Code, an affiliate of Four Marketing Group (alternatively referred to herein as the "Buyer" or the "Lender" as appropriate) expressed an interest in purchasing a number of stores from the U.S. companies. During these discussions, they temporarily acquiesced in the Debtors' continued sale of product under the Agent Provocateur name.

16.     As a result of their discussions, the Buyer made a proposal to purchase a number of stores (twelve to be precise) and to fund ongoing operations, to the extent necessary during these bankruptcy cases, in order to consummate the sale.

17.     During this recent period, as negotiations with the Buyer have progressed, the Debtors have continued to operate their U.S. stores on a day-to-day existence.  However, without a continued supply of stock from their former Parent or the Buyer to replenish their inventory, and with several landlords closing in, the Debtors' survival as operating entities has been imperiled, and their business has deteriorated.  Several of the Debtors' landlords have filed, or

they have threatened to file, actions to evict the Debtors from certain U.S. locations, including several locations the Buyer wishes to acquire.  Terminations are imminent at a couple of these locations; in fact, one landlord is about to evict one of the Debtors from a prime location.  These actions have forced the Debtors to file the within chapter 11 petitions in order to stave off any lease terminations or evictions relating to these locations.

18.    In sum, during the past month, the Debtors were on the verge of shutting down their businesses and filing chapter 7 cases in this Court—that is, until the Buyer emerged to propose a purchase of a number of the Debtors' stores.  As a result, despite the numerous difficulties set forth above, the Debtors have identified a viable path forward, through an expedited sale process with financing from the Buyer, to ensure sustainability for a number of the Debtors' retail stores pending their eventual sale.

### Preserving the U.S. Stores for a 363 Sale

19.    The Buyer, in its capacity as the Lender, has proposed to provide debtor in possession financing (the "DIP Loan") to the Debtors to the extent existing cash flow is insufficient to sustain their operations through the date of a Court-approved sale.[4]  The Buyer also has proposed to purchase twelve stores through an asset purchase agreement with the Buyer, as the stalking horse bidder, pursuant to customary bid, auction and sale procedures under Bankruptcy Code section 363, which are the subject of a motion to be brought before this Court.

20.    The Debtors view this alternative as being decidedly more beneficial than, and preferable to, a chapter 7 case in that the prospect of a successful sale promises to preserve employment for a number of store managers and employees, and it will also result in the satisfaction of a number of claims in these cases—particularly with respect to those landlords at

---

[4] There is no lender or secured party that has security interest in the Debtors' cash.

stores for which the Buyer elects to have the leases in question assumed and assigned by the Debtors. This alternative may also allow for a limited distribution to the Debtors' unsecured creditors.

21.     As of the time of the filing of this Declaration, the Buyer's APA and DIP agreement remain subject to finalization, but I anticipate these agreements will be brought before the court for approval in the very near term.

### The Chapter 11 Proceedings

22.     Despite the difficulties set forth above, the Debtors have identified a viable path forward through an expedited sale process with financing from the Lender to ensure sustainability for a number of the Debtors' retail stores pending their eventual sale.

23.     This course of action is critical to maximizing recoveries for the Debtors' creditors and preserving the employment of many of the Debtors' employees.

### PART II

### SUMMARY OF FIRST AND SECOND DAY MOTIONS
### AND BASES FOR RELIEF REQUESTED

24.     To sustain the Debtors' businesses through the sale process, it is essential that certain relief be obtained from the Court following the filing of the petitions. Because sales and operations must continue in the ordinary course of business in order to preserve the value of the Debtors' estates, the Debtors have filed several First Day Motions designed to facilitate their transition into chapter 11. The Debtors anticipate that the Court will conduct a hearing soon after the Petition Date at which the Court will hear and consider the First Day Motions. In addition, the Debtors expect to file a number of other motions shortly after the Petition Date (the "Second Day Motions").

25.     I have reviewed each of the First Day Motions with counsel for the Debtors, and I

believe the relief sought in each of the motions is designed to meet the goals described, is critical to preservation of the Debtors' businesses, and is in the best interests of the Debtors' estates and creditors.  I have also reviewed and assisted with assembling final or near final drafts of the Second Day Motions that will be forthcoming very soon.  I affirm the factual representations set forth in each of the First Day Motions and those that will be set forth in the Second Day Motions. A summary of the relief requested and the facts in support is set forth below.

### *Administrative Motions*

<u>Motion for Joint Administration</u>

26.     The Debtors request an order directing the joint administration of the chapter 11 cases for procedural purposes only pursuant to Bankruptcy Rule 1015(b), providing that the Court maintain one file and one docket for both cases under the lead case, Agent Provocateur, Inc., and granting authority to file their monthly operating reports on a consolidated basis.

27.     I understand that joint administration will result in a reduction of fees and costs by eliminating the need for duplicative filings and objections and allowing easier monitoring of the proceedings by interested parties.  For that reason, I believe joint administration is in the best interests of the Debtors and all parties in interest.

<u>Motion for Expedited Hearings and Shortened Notice and Response Periods</u>

28.     I also expect the Debtors to file a motion requesting expedited hearings on a number of the First Day and Second Day Motions, as well as shortened response periods with respect thereto, and approving the form and manner of a proposed notice of the expedited hearings.  The Debtors believe there is good cause under the circumstances for expedition of hearings on a number of these matters and that such relief will be vital to ensuring an ability to function effectively in chapter 11.

*Operational Motions Requesting First or Second Day Relief*

29.     The Debtors also intend to ask for additional relief with respect to the following pleadings, either on the first day or shortly thereafter, including, among others:  applications to retain bankruptcy counsel and a financial advisor; a utilities motion, a DIP financing motion, and a motion for establishment of sale, auction, and bid procedures with the Buyer as the proposed stalking horse bidder.

<u>Application to Retain Thompson Hine LLP as Counsel to the Debtors</u>

30.     The Debtors seek approval to retain Thompson Hine as their counsel to represent them in these cases.  Thompson Hine was selected because of its extensive bankruptcy experience and its reputation in the field of business reorganizations under chapter 11 of the Bankruptcy Code.  Thompson Hine is an approximately 380 attorney, full service law firm with the necessary resources to represent the Debtors' interests in these cases and any related proceedings.  The Debtors contemplate that Thompson Hine will render general legal services as needed throughout the course of these cases, including, without limitation:  advising the Debtors regarding their rights, powers, and duties as debtors in possession in the continued operation of their business; assisting in the preparation of necessary applications, motions, pleadings, reports and other legal papers required in connection with the administration of the estates; assisting with the 363 sale process; and performing all other legal services that may be requested or required by the Debtors.  Subject to approval by the Court, Thompson Hine will charge for its services on an hourly basis at its preferred rates, which are a discount from its standard rate.  The Debtors believe Thompson Hine is well qualified to act as their counsel.

<u>Application to Retain Applied Business Strategy LLC as Financial Advisor to the Debtors</u>

31.     The Debtors also seek approval to retain Applied Business Strategy LLC as their

financial advisor in these cases.  The Debtors selected Applied Business Strategy as financial advisor because of its extensive experience providing such services to Fortune 500 companies and mid-market and small market companies in various industries.  The Debtors require the services of Applied Business Strategy to assist with strategic reorganization alternatives; preparation of cash forecasts, budgets and monthly operating reports; acting as liaison with creditors and parties in interest, including the financial advisor to the Buyer/Lender; and providing such other advisory services as the Debtors may request or require.

<u>Utilities Motion</u>

32.    The Debtors request that the Court enter an Order prohibiting the Debtors' utility providers from altering, refusing or discontinuing services, pending determination of adequate assurance of payment, and approving the proposed adequate assurance of payment procedures outlined in the motion.  Needless to say, uninterrupted utility service is essential to the operation of the Debtors' stores and any refusal of service, even for a short time, could result in substantial harm.

33.    I am informed by counsel that, pursuant to section 366 of the Bankruptcy Code, a utility may refuse or discontinue service to a debtor in a chapter 11 case only if it is not timely provided with adequate assurance of payment for postpetition services.  I am also informed the Bankruptcy Code allows for modification of the amount of any adequate assurance of payment. Accordingly, the utilities motion requests approval of procedures allowing the Debtors to provide satisfactory assurance of payment to each utility or, alternatively, to establish the precise form of adequate assurance that is satisfactory to each utility.  Counsel has informed me that "assurance of payment" can take the form of, among other things, a cash deposit, a prepayment, or another form of security that is mutually agreed upon between the utility and the debtor.  As

adequate assurance of payment, the Debtors propose to provide a two week cash deposit to each

utility that requests one or some other mutually agreeable payment.  The Debtors believe this is a

reasonable proposal under the circumstances of these cases, one that will be sufficient to provide

adequate assurance to utility providers and one that will not prejudice the rights of any utility that

provides such services.

DIP Financing Motion

34.    The Debtors seek interim and final authority to obtain postpetition financing on

customary terms in accordance with the requirements of the Bankruptcy Code.  As mentioned,

several terms of the DIP loan remain subject to finalization, but in short, it provides for lending

by the Lender, but only to the extent the Debtors' ongoing cash flow may be insufficient to fund

operations through the time of a sale of the business.

35.    The Debtors' cases are, perhaps, a bit unusual in that there are no secured parties

with an interest in their cash.  According to projections, cash flow from operations will be

sufficient to fund their business for a period of time during the bankruptcy.  However, the

Debtors likely will require additional funding at one or more points during these cases in order to

allow them sufficient time to implement sale and bid procedures designed to achieve a sale of

assets pursuant to section 363.

36.    To achieve this goal, the Buyer has offered the DIP Loan, in an amount of up to

$500,000, to facilitate the strategy set forth above.  The DIP Loan is a senior superpriority loan

from the Lender, to be used to the extent necessary to fund day-to-day operations.  Subject to

approval by the Court, it will be secured by a first priority lien on substantially all of the

Debtors' assets.

37.    Under the dire circumstances set forth above, there really is no source of

financing, secured or otherwise, available to the Debtors, apart from that to be provided by Lender pursuant to the DIP Loan. The Lender is the one and only party in existence with both the means and motivation to extend the financing set forth in the DIP Loan, which provides the only viable means of averting an immediate liquidation. The Debtors believe that authority to obtain the DIP Loan is in the best interests of the Debtors, their estates, their employees, and their creditors.

38.    Given the Debtors' precarious and very fragile existence during these last five weeks, as explained in detail above, the DIP Loan is, in my view, the only realistic option available—apart from a permanent and immediate cessation of all operations.

<u>Wage and Benefit Motion</u>

39.    The Debtors also have filed or shortly will file a motion for interim and final authorization to pay prepetition wages and expense reimbursements and related costs to employees, but only to the extent, if any, that such amounts may be due and owing, in accordance with sections 507(a)(4), 363(b)(1), and 105(a) of the Bankruptcy Code. In addition, the Debtors seek authority to continue funding pre-petition benefits and other premiums.

40.    Ensuring uninterrupted wages and benefits is critical to maintaining the Debtors' workforce of employees, who have the knowledge and experience needed to operate the Debtors' retail locations on a day-to-day basis, and some of whom might decide to leave if they are not paid or anticipate they may not be paid. The Debtors intend to keep twelve of their stores open through consummation of a 363 sale; the present intention is to close the remainder within about a week of the Petition Date. To ensure continued operations of the twelve stores the Buyer wishes to purchase, as well as orderly closures of the remaining stores, it is important to ensure that store employees will be paid.

41.     Similarly, nearly all of the Debtor's related insurance premiums are critical for the Debtors to maintain in order to continue benefits and even operations, as the failure to fund them would result in defaults under a number of the Debtors' leases and imperil their ability to operate the stores.

Taxes

42.     The Debtors request authorization to remit and pay sales tax, use tax, state and local withholding tax, and other similar taxes and charges.  The Debtors collect and withhold an assortment of taxes and fees that they remit to various federal, state, and local authorities.  Such taxes are held in trust for eventual payment to the authorities.  In addition to the fact that such taxes are held by the Debtors in trust, such taxes may constitute priority claims pursuant to Bankruptcy Code section 507(a)(8).  Accordingly, I believe that the relief requested in the motion is in the best interests of the Debtors' estates, their creditors and all other parties in interest, and will facilitate continued operation of the Debtors' businesses.

Bank Accounts and Cash Management

43.     The Debtors also request authorization to continue their existing cash management system, including continued maintenance of existing bank accounts and business forms.  In the ordinary course of business, the Debtors utilize a cash management system to collect, transfer, and disburse funds generated by their stores through bank accounts to collect and track funds.  The Debtors can assure a clear distinction between pre and postpetition payments, and there is minimal risk that any unauthorized prepetition claims will be paid.  In consideration of the importance of the bank accounts, and in light of the Debtors' ability to track funds, the Debtors request authority to maintain and continue using bank accounts as they did prior to the Petition Date in the ordinary course of business.  Moreover, because opening new

13

debtor in possession accounts and obtaining new checks and business forms denoting the Debtors' status as debtors would be burdensome, the Debtors also request authority to use existing checks and business forms without placing the label "debtor in possession" thereon.  I am informed by counsel that under circumstances such as these, variance from strict enforcement of the U.S. Trustee Guidelines is often permitted.

44.     For reasons set forth in the motion, it is important for these systems to remain intact to ensure seamless continuation of operations and uninterrupted collection of revenues.

<u>Sale, Auction, and Bid Procedures</u>

45.     Upon finalization of remaining terms of the stalking horse asset purchase agreement with the Buyer, the Debtors will shortly bring forth a motion for establishment of customary bid, auction, and sale procedures for the Court's consideration.

46.     The foregoing is a summary of those First and Second Day Motions the Debtors intend to file.  As mentioned, there may be other motions seeking relief of various types in the early stages of the bankruptcy.

## PART III

## INFORMATION REQUIRED BY LOCAL RULE 1007-2

47.     In accordance with Local Rule 1007-2, this section and the attached schedules provide additional information required by the rule.

48.     Pursuant to Local Rule 1007-2(a)(3), to the best of the Debtors' knowledge, no committee was organized prior to the Petition Date.

49.     Pursuant to Local Rule 1007-2(a)(4), Schedule 1 lists the holders of the Debtors' thirty largest unsecured claims, excluding insiders, on a consolidated basis, with their names and addresses, etc.

14

50.    Pursuant to Local Rule 1007-2(a)(5), Schedule 2 confirms that to the best of the Debtors' knowledge, there are no holders of secured claims.

51.    Pursuant to Local Rule 1007-2(a)(6), Schedule 3 shows a summary of the Debtors' assets and liabilities.

52.    Pursuant to Local Rule 1007-2(a)(7), there is no publicly held stock of either Debtor.

53.    Pursuant to Local Rule 1007-2(a)(8), Schedule 4 confirms that to the best of the Debtors' knowledge, there is no property of the Debtors in the possession or custody of any custodian, public officer, mortgagee, pledgee, assignee of rents, secured creditor, or agent for any such entity.

54.    Pursuant to Local Rule 1007-2(a)(9), Schedule 5 provides a list of the leased premises from which the Debtors operate their stores.

55.    Pursuant to Local Rule 1007-2(a)(10), Schedule 6 lists the locations of the Debtors' substantial assets and books and records, and the nature, location, and value of any assets held outside the territorial limits of the United States.

56.    Pursuant to Local Rule 1007-2(a)(11), Schedule 7 lists each pending or threatened action or proceeding against the Debtors or their property where a judgment or a seizure of property may be imminent.

57.    Pursuant to Local Rule 1007-2(a)(12), Schedule 8 lists the individuals who serve as the Debtors' senior management, with a brief summary of their relevant responsibilities and experience.

58.    Pursuant to Local Rule 1007-2(b)(1) and (2), Schedule 9 sets forth the estimated amounts to be paid for:  (i) weekly payroll to the Debtors' employees for the thirty day period

following the Petition Date, and (ii) to officers, directors, and financial and business consultants retained by the Debtors for the thirty day period following the Petition Date.

59.    Pursuant to Local Rule 1007-2(b)(3), Schedule 10 sets forth a schedule with a list of estimated cash receipts and disbursements, net cash gain or loss, obligations, and receivables expected to accrue that remain unpaid (other than professional fees) for the thirty day period following the Petition Date.

## CONCLUSION

60.    The foregoing describes the facts and circumstances that gave rise to the need for filing these chapter 11 cases and the need for the critical relief requested in the First Day Motions and the Second Day Motions. The Debtors must resume business as usual following the commencement of the cases in order to preserve and maximize the value of their businesses. I believe that if the Court grants the relief requested in the First and Second Day Motions, the prospect of achieving this objective will be greatly enhanced, to the ultimate benefit of the bankruptcy estates and creditors and parties in interest.

61.    I declare, to the best of my knowledge and after reasonable inquiry, under penalty of perjury under the laws of the United States of America, that the foregoing is true and correct.

Executed this 10th day of April 2017.

/s/ Amanda Brooks
Amanda Brooks

## Schedule 1

## 20 Largest Unsecured Claims (Excluding Insiders)[5]

| Name of creditor and mailing address | Name, phone and email address of creditor contact | Nature of claim (for example, trade debt, bank loan, etc.) | Indicate if claim is contingent, unliquidated, or disputed | Total amount of unsecured claim |
|---|---|---|---|---|
| US Customs and Border Protection 1100 Raymond Boulevard NJ, Newark, 07102 | Goachim Mele Goachim.mele@cbp.dhs.gov 973-368-6819 | custom duties | | $689,993 |
| Agent Provocateur IP Limited (previously known as SDI (Acqco 7) Limited) 154 Clerkenwell Road London EC1R 5AB | Charles Perez charles.perez@agentprovocateur.com 44-(0)020-7923-5200 | trade debts | | 282,082 |
| Larstrand Corp. / 675 Madison LLC Friedland Properties 22 E 65th Street New York, NY 10065 | Hoon Chang hchang@friedlandproperties.com 212-744-3300 | rent | | 172,583 |
| Barclays Bank plc Barclays, Level 6 1 Churchill Place, London, E14 SHP | Sara Walser sara.walser6@barclays.com 44-(0)20-7116-2542 | rent | | 167,698 |
| China National Consumer Electrics & Electronics No. 910, 9th Section Jinsong, Chaoyang District Beijing, 10021 | Daniel Yang daniel.yang@tych.com.cn 0086-139-1179-5173 | trade debts | | 107,788 |
| Hamburger Properties 1504 So. El Camino Real San Mateo, CA 94402-3022 | Bob Beber bob.beber@gmail.com 650-341-8606 | rent | | 81,198 |
| Short Hills Associates LLC Department 53501 PO Box 6700 Detroit, MI 48267-0535 | Partee Nannette NPartee@Taubman.com 248-258-7387 | rent | | 79,956 |
| Professional Retail Outlet Services, LLC 3050 Union Lake Rd. Suite 8-F Commerce Township, MI 48382 | Paula Jendrowski PJendrowski@proservicecall.com 866-335-3500 | services | | 79,453 |

---

[5] None of the information shown on this Schedule 1 or elsewhere in the Declaration or Schedules should be deemed to constitute an admission of liability, nor shall it by binding upon, the Debtors.  Moreover, amounts shown are subject to customary offsets, credits and adjustments that may not be reflected.

| Name of creditor and mailing address | Name, phone and email address of creditor contact | Nature of claim (for example, trade debt, bank loan, etc.) | Indicate if claim is contingent, unliquidated, or disputed | Total amount of unsecured claim |
|---|---|---|---|---|
| Grunfeld Desiderio Lebowitz Silverman Klestadt LLP 599 Lexington Avenue 36th Floor New York, NY 10022-7648 | Robert B. Silverman RSilverman@gdlsk.com 212-973-7730 | professional services | | 64,889 |
| Ala Moana Center Acquisition LLC PO Box 860375 Minneapolis, MN 55486-0375 | Liu Pan Pan.Liu@generalgrowth.com 808-951-8899 | rent | | 62,849 |
| Desert Hills Premium Outlets PO BOX 822873 Philadelphia, PA 19182 | Jason Hermesch JHermesch@simon.com 317-263-7972 | rent | | 53,589 |
| 133 Mercer Street, LLC 352 Seventh Avenue 12th Floor New York, NY 10001 | Gina Fleisher bookkeeper@fleishergroup.com 770-873-1609 | rent | | 45,200 |
| CPI-Phipps LLC Phipps Plaza PO Box 772842, Chicago, IL 60677-2842 | Jason Hermesch JHermesch@simon.com 317-263-7972 | rent | | 44,217 |
| The Bowerman Group PO Box 1255 West Falmouth, MA 02574 | Rob Bowerman treasurer@bowermangroup.com 508-540-7414 | rent | | 39,790 |
| The Shoppes at The Palazzo SDS - 12 2781 PO Box 86 Minneapolis, MN 55486-2781 | Jing Y. Lin Sophia.lin@generalgrowth.com 702-414-4525 | rent | | 35,721 |
| Keenpac / Bunzl Distribution Midcentral 6955, N Hamlin Ave Lincolnwood, IL 60712 | Ann Hallberg annhallberg@keenpac.com 847-733-1469 | rent | | 34,831 |
| Newbury 123 Investment LLC c/o Boylston Development Corporation 41 Winter Street, Ste 60 Boston, MA 02108 | Patrick Brown patrick.brown@cbre-ne.com 617-451-2174 | rent | | 33,606 |

| Name of creditor and mailing address | Name, phone and email address of creditor contact | Nature of claim (for example, trade debt, bank loan, etc.) | Indicate if claim is contingent, unliquidated, or disputed | Total amount of unsecured claim |
|---|---|---|---|---|
| Brickell City Centre Retail LLC<br>799, Brickell Plaza Suite 802<br>Miami, FL 33131 | Vincent Ash<br>Vincent.Ash@simon. com<br>786-233-5391 | rent | | 28,289 |
| 7961 Melrose Associates, LLC<br>7951 Melrose Avenue<br>Los Angeles, CA 90046 | Isac Novian<br>inov@sbcglobal.net<br>310-402-7388 | rent | | 26,609 |
| 259 Elizabeth Street – Katherine Chou<br>408 8th Ave., Suite 206<br>New York, NY 10001 | Katherine Chou<br>mingc@aol.com<br>212-629-5890 | rent | | 24,857 |

## **Schedule 2**

### **5 Largest Secured Claims**

To the best of the Debtors' knowledge, they have no secured creditors.

## Schedule 3

### Summary of Assets and Liabilities

|  | LLC | Inc |
|---|---|---|
| **Fixed Assets (NBV)** | | |
| FIXTURES AND FITTINGS | 218,936.94 | 4,456,052.38 |
| LEASEHOLD IMPROVEMENTS | 70,166.81 | 801,466.22 |
| COMPUTER EQUIPMENT | 3,995.38 | 10,279.80 |
| OFFICE EQUIPMENT | - | 700.06 |
| SETUP COSTS | - | 614.27 |
| | 293,099.13 | 5,269,112.73 |
| | | |
| **Current Assets** | | |
| DEBTORS | | |
| INTERCOMPANY DEBTORS | | |
| AP Inc | 2,099,490.00 | |
| CONCESSION DEBTORS | | 74,762.50 |
| RENT DEPOSIT | 13,500.00 | 290,061.34 |
| STAFF LOAN ACCOUNT | | 5,300.00 |
| TAKINGS - AMEX & CREDIT CARD (approx) | 11,748.20 | 14,626.39 |
| | | |
| CASH IN BANK AND IN HAND | | |
| WELLS FARGO | 198,475.90 | 1,262,469.71 |
| PETTY CASH | 200.00 | 2,850.00 |
| TILL FLOATS | 200.00 | 2,950.00 |
| TAKINGS - CASH (approx) | 7,198.58 | 38,683.69 |
| | 2,330,812.68 | 1,691,703.63 |
| | | |
| **Total Assets** | **2,623,911.81** | **6,960,816.36** |

|  | LLC | Inc |
|---|---|---|
| **Liabilities** | | |
| CREDITORS | | |
| INTERCOMPANY CREDITORS | | |
| AP LLC | | - 2,099,490.00 |
| AP UK | - 1,262,936.01 | - 8,200,030.22 |
| EXPENSE CREDITORS | - 20,829.52 | - 1,339,815.12 |
| RENT CREDITORS | - 102,025.22 | - 806,045.35 |
| GIFT VOUCHERS | - 2,322.99 | - 116,690.36 |
| SALES TAX | | |
| Jan Return | - 14,822.66 | - 97,628.61 |
| Feb Return (Approx) | - 12,026.98 | - 105,364.47 |
| Mar Return (Approx) | - 6,274.45 | - 58,554.49 |
| | | |
| CORPORATION TAX | Unknown | Unknown |
| BUSINESS, STATE LICENCES RENEWAL | Unknown | Unknown |
| STAFF WAGES | Unknown | Unknown |
| STAFF TAXES | Unknown | Unknown |
| **Total Liabilities** | **- 1,421,237.83** | **- 12,823,618.62** |

## Schedule 4

**Property in Possession of Custodian, etc.**

None.

**Schedule 5**

**Leased Premises**

| Location | Address |
|---|---|
| Ala Moana – Hawaii | 1450 Ala Moana Blvd.<br>Space #2533<br>Honolulu, HI 96814 |
| Atlanta | Phipps Plaza Mall<br>Level 1 Monarch Court<br>3500 Peachtree Road NE<br>Atlanta, GA 30326 |
| Bal Harbour | 9700 Collins Ave. 201<br>Bal Harbour Shops, Bal Harbour<br>Miami FL 33154 |
| Bloomingdales BH | 8500 Beverly Boulevard<br>Los Angeles, CA 90048 |
| Bloomingdales NY | Bloomingdales<br>Intimate Apparel - 4th Floor<br>1000 Third Avenue<br>New York 10022 |
| Bloomingdales SC Plaza | South Coast Plaza<br>3rd Floor, Intimate Apparel<br>3333 Bristol Street<br>Costa Mesa, CA 92626 |
| Bloomingdales SF | Bloomingdale's<br>845 Market St.<br>San Francisco, CA 94103 |
| Bloomingdales Soho | 504 Broadway<br>New York, NY 10012 |
| Boston | 123 Newbury Street<br>Boston, MA 02116 |
| Chicago | 47 East Oak Street<br>Chicago, IL 60611 |

| Coral Gables | Village of Merrick Park<br>360 San Lorenzo Ave<br>Suite 1502<br>Coral Gables FL 33146 |
|---|---|
| Dallas, Texas | North Park Center<br>8687 N Central Expressway<br>Suite 1320<br>Dallas, TX 75225 |
| Desert Hills | 48650 Seminole Dr.<br>Ste #1138<br>Cabazon, CA 92230 |
| L'agent Elizabeth St. | 259 Elizabeth St<br>New York, NY 10012 |
| L'agent Melrose Avenue | 8503 Melrose Ave.<br>West Hollywood, CA 90069 |
| Las Vegas Forum | The Forum Shops at Caesars<br>3500 Las Vegas Boulevard, Suite R18<br>Las Vegas NV 89109 |
| Las Vegas Palazzo | Grand Canal Shoppes - The Palazzo<br>3327 Las Vegas Boulevard South<br>Suite 2742<br>Las Vegas Nevada 89109 |
| Madison | 675 Madison Avenue<br>New York 10065 |
| Manhasset, New York | Americana Manhasset<br>2036 Northern Blvd.<br>Manhasset NY |
| Melrose Avenue | 7961 Melrose Avenue<br>Los Angeles CA 90046 |
| Mercer St. | 133 Mercer Street<br>New York 10012 |
| Miami - Brickell | 701 S. Miami Avenue<br>Suite 154-B<br>Miami, FL. 33131 |

| | |
|---|---|
| Rodeo | 242 N. Rodeo Drive<br>Beverly Hills CA 90210 |
| Saks Beverly Hills | 9600 Wilshire Blvd.<br>Beverly Hills CA 90212 |
| Saks Houston | Saks Fifth Avenue<br>5175 Westheimer Rd.<br>Level 2, Intimates,<br>Houston, TX, 77056 |
| Saks New York | 611 5th Avenue<br>New York 10022 |
| Saks SC Plaza | Saks Fifth Avenue<br>South Coast Plaza<br>3333 Bristol St.<br>Costa Mesa, CA |
| San Francisco | 54 Geary Street<br>San Francisco, CA 94108 |
| Short Hills | 1200 Morris Tpke.<br>Short Hills NJ 07078 |
| Woodberry Common | 498 Red Apple Ct.<br>Central Valley, NY 10917 |

## **Schedule 6**

### **Assets and Books and Records**

The Debtors' assets are primarily located at each of the store locations shown on Schedule 5.

Many of the Debtors' books and records are held at 154 Clerkenwell Road London, England, EC1R 5AB.

## Schedule 7

**Pending and Threatened Actions**

*Bal Harbour Shops, LLLP v. Agent Provocateur, Inc*., 2017-000410-CC-24, Miami-Dade County Court (Florida eviction proceedings)

*675 Madison LLC v. Agent Provocateur, Inc*., 17-58975, Civil Court of the City of New York (New York eviction proceedings)

Notices of past due rents from landlords at the following store locations:  LV Forum; Dallas; San Francisco; Madison, NY; Rodeo; Woodbury; Boston Newbury; Chicago Oak Street; Miami Coral Gables; LV Palazzo; New Jersey Short Hills; and NY Elizabeth Street.

## Schedule 8

### Senior Management

| Name and Position | Brief Summary of Responsibilities/Experience |
| --- | --- |
| Amanda Brooks | Global Retail Director – responsible for managing retail operations in US and internationally. |
| Wilson Cheng | Management Accountant – responsible for accounting functions for US and international operations. |
| Amanda Cotler | East Coast Director of stores – manages stores in New York and other eastern US locations. |
| Erin Capecchi | West Coast Director of stores – manages stores in western US locations. |
| Keith Wilks (resigned in 2016) | Finance Director (formerly responsible for finances in US and internationally) |

## Schedule 9

**Payroll and Payments to Officers, Etc. for 30 Days of Bankruptcy**

| | |
|---|---|
| Payments to Employees (not including officers) | $350,000 |
| Payments to Officers, Directors | None. |
| Payments to Financial Advisors | The Debtors anticipate retaining their financial advisor in bankruptcy, but they do not anticipate making payment to the advisor during the 30 days following the Petition Date. |

## Schedule 10

### Estimated Receipts and Disbursements

| | |
|---|---|
| Cash Receipts | $1.7 million |
| Cash Disbursements | $2.1 million |
| Net Cash Gain | ($0.4) million |
| Unpaid Obligations | $12.2 million at filing date and $0.3 million of estimated post-petition obligations due bankruptcy professionals, U.S. Trustee, accrued sales tax and accrued inventory purchases (exclusive of $2.1 million intercompany obligation) 30 days after filing. |
| Uncollected Receivables | $0.1 million (exclusive of a $2.1 million intercompany receivable) |