Amish R. Doshi, Esq.
**MAGNOZZI & KYE, LLP**
23 Green Street, Suite 302
Huntington, New York 11743
Telephone: (631) 923-2858
Email:        adoshi@magnozzikye.com

And

Shawn M. Christianson, Esq. (CSB #114707)
Valerie Bantner Peo, Esq. (CSB # 260430)
**BUCHALTER, A Professional Corporation**
55 Second Street, 17th Floor
San Francisco, California 94105-2126
Telephone: (415) 227-0900

Attorneys for TriNet Group, Inc.

Hearing Date: April 19, 2017
Hearing Time: 2:00 PM

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>**AGENT PROVOCATEUR, INC. et. al.,**<br><br>Debtors. | Chapter 11<br><br>Case No.   17-10987 (MEW)<br><br>Jointly Administered |

**TRINET GROUP, INC.'S LIMITED OBJECTION TO DEBTORS' MOTION FOR ORDER UNDER BANKRUPTCY CODE SECTIONS 105, 363(b), 507(a), 541, 1107(a) AND 1108 AUTHORIZING, BUT NOT DIRECTING, THE DEBTORS TO PAY PREPETITION WAGES, COMPENSATION AND OTHER EMPLOYEE BENEFITS ("LIMITED OBJECTION")**

TriNet Group, Inc. and its subsidiaries, including TriNet HR III, Inc., and as successor in interest to Gevity HR, Inc. and its wholly-owned subsidiaries Gevity HR X, L.P. and Gevity HR L.P., (collectively, "TriNet"), a creditor and contract counter-party in the above-captioned Chapter 11 cases, submits this Limited Objection regarding the Debtors' Motion for Order Under Bankruptcy Code Sections 105, 363(b), 507(a), 541, 1107(a) and 1108 Authorizing, But Not Directing, The Debtors To Pay Prepetition Wages, Compensation and Other Employee Benefits ("Wage Motion") filed by Agent Provocateur, Inc., *et al*. ("Debtors").

**I.     INTRODUCTION**

1. By the Wage Motion, the Debtors seek Bankruptcy Court authority to, among other things, pay pre-petition obligations to current employees, including accrued pre-petition wages, salaries, commissions, and other cash and non-cash compensation claims, including vacation.

2. TriNet objects to the Wage Motion only to the extent that it attempts to obligate TriNet to continue to provide services to the Debtors pursuant to agreements that were terminated pre-petition.

3. TriNet does not object to the balance of the relief sought by the Wage Motion, including the Debtors' request for authority to pay employees pre-petition wages and other compensation.

4. Accordingly, TriNet requests that the Court deny the Wage Motion to the extent it purports to compel TriNet to perform pursuant to terminated contracts.

**II.    FACTUAL BACKGROUND**

5. The Debtors commenced the above-captioned case on April 11, 2017 ("Petition Date"). An order directing joint administration was entered on April 17, 2017.

6. Prior to the Petition Date, TriNet provided payroll and other services to the Debtors and several non-debtor affiliates through a co-employment agreement.

7. Under this co-employment arrangement, the Debtors maintained day-to-day control over and managed the Debtors' employees, while TriNet handled human resources management and benefits administration responsibilities. Declaration of Deborah L. Marsh in support of the Limited Objection, filed herewith ("Marsh Declaration"), ¶ 3.

8. On or about September 28, 2007, Agent Provocateur, Inc. ("API") entered into a Professional Services Agreement with TriNet's predecessor, Gevity HR X, L.P. ("API Agreement"). Marsh Declaration ¶ 4.

9. On or about September 29, 2007, Agent Provocateur, LLC ("APL") entered into a Professional Services Agreement with TriNet's predecessor, Gevity HR L.P. ("APL Agreement," and together with the API Agreement, the "TriNet Agreements"). Marsh Declaration ¶ 5.

10. In addition to the TriNet Agreements, TriNet, through its Canadian affiliate Employer Group Canada, Inc., was a party to a Professional Services Agreement ("APC Agreement") with the Debtors' affiliate, Agent Provocateur Canada, Inc. ("APC"). Marsh Declaration ¶ 6.[1]

11. Section 19.A of each of the TriNet Agreements and provides that, "In the event of a breach, violation or default ('Breach') of any term or condition of this Agreement by one party, the other party shall have the absolute right to immediately terminate this Agreement by giving written notice of termination to the Breaching party." Section 9.b of the APC Agreement provides that it "is terminated upon [APC's] failure to pay any of [TriNet's] invoices …"

12. Section 19.B of each of the TriNet Agreements contain identical "deemed Breaches" which give rise to the non-breaching party's right of termination.

---

[1] Because the TriNet Agreements and the APC Agreement represent TriNet's trade secrets, copies of those agreements are not attached to the Marsh Declaration. TriNet believes that the Debtors possess complete copies of the agreements discussed herein, and TriNet will make copies of the agreements available for the Court's *in camera* review, if required.

3

13. Such deemed Breaches include:

"(i) a party's failure to pay any amounts when due as required by this Agreement;
…
"(v) default under a separate services agreement where one party is Gevity (or an affiliate under common ownership and control with Gevity) and the other party is the Client (or an affiliate under common ownership and control with the Client)"

14. On or about March 16, 2017, APC breached the APC Agreement by failing to timely pay TriNet. APC's breach constituted a breach by the Debtors pursuant to Section 19.B(v) of the TriNet Agreements.

15. Accordingly, the APC Agreement terminated and TriNet invoked the cross-default provision of Section 19.B(v) to terminate the TriNet Agreements.

16. On or about March 30, 2017, TriNet sent the Debtors and APC a letter ("Termination Notice") indicating that the TriNet Agreements and the APC Agreements were terminated effective March 16, 2017.[2] A copy of the Termination Notice is attached as Exhibit "A" to the Marsh Declaration.

17. As an accommodation to the Debtors, and without waiving the Debtors' breach or TriNet's earlier termination of the TriNet Agreements, TriNet agreed to process employee payments for the Debtors' March 31, 2017 payroll, provided the Debtors advanced sufficient funds to TriNet.

18. Accordingly, TriNet made distributions to the Debtors' employees on April 3 and April 5, 2017.

19. On April 14, 2017, TriNet made a final "true-up" distribution to the Debtors' employees on account of the March 31, 2017 payroll.

---

[2] Section 19.A of the TriNet Agreements authorizes TriNet to make termination effective as of the date of the breach. ("At the option of the non-breaching party the termination date shall be the date of the Breach, the date it sends notice, the date notice is received by the Breaching party, or any later date selected by the non-breaching party.")

20. Because the Debtors advanced insufficient funds to cover the entire "true-up" distribution,[3] TriNet paid out an additional $37,034.64 in order to cover the shortfall.[4]

21. On April 12, 2017, the Debtors filed the Wage Motion seeking authority to, among other things, pay certain pre-petition wages, compensation and other employee benefits.

22. The Wage Motion characterizes the termination of the TriNet Agreements as "alleged" and the Debtors indicate in a footnote that they "dispute that TriNet's asserted termination was effective or proper …." Wage Motion ¶ 8, n.2.

23. The Debtors' position in the Wage Motion that TriNet's termination of the TriNet Agreements was allegedly ineffectual is of concern to TriNet and TriNet could not allow such a position to stand without response.

24. TriNet believes the Termination Notice operated to terminate the TriNet Agreements and that TriNet has no obligation to process future payroll on behalf of the Debtors.

25. Moreover, the Debtors have not provided TriNet with employee payroll information that is required for TriNet to calculate future employee wages, withholdings, etc. Marsh Declaration ¶ 11.

26. Accordingly, TriNet understands that the Debtors know that TriNet will not run future payroll on behalf of the Debtors.

### III.    ARGUMENT

    **A.    TriNet Cannot Be Compelled To Perform Under the Terminated TriNet Agreements.**

27. TriNet has no remaining obligations to Debtors under the TriNet Agreements because those agreements were terminated pre-petition. TriNet's and the Debtors' rights under

---

[3] The funds distributed by TriNet on April 14, 2017 were advanced by the Debtors prior to the Petition Date.

[4] TriNet has provided the Debtors with invoices representing the calculation of the shortfall, which TriNet understands are under review by the Debtors. *See* Marsh Declaration, Exhibit "E."

the TriNet Agreements are governed by state law. *Butner v. United States*, 440 U.S. 48, 99 (1979).

28.  Section 24 of the TriNet Agreements provides that they are governed by Florida law. "Florida courts have long upheld contractual provisions granting one party the unilateral termination rights [*sic*] if supported by consideration." *Jenkins v. Eckerd Corp.*, 913 So. 2d 43, 55 (Fla. Dist. Ct. App. 1st Dist. 2005) (internal citations omitted). "[U]nder Florida law a provision requiring written notice, such as that contained in the termination clause in question here, prevents the promise made by the party with the right of termination from being regarded as illusory in nature. *Vila & Son Landscaping Corp. v. Posen Constr. Inc.*, 99 So. 3d 563, 568 (Fla. Dist. Ct. App. 2d Dist. 2012) (internal citations omitted).

29.  Because the TriNet Agreements were terminated under applicable law before the commencement of the bankruptcy case, the TriNet agreements are not executory. *See, e.g., Super Nova 330 LLC v. Gazes*, 693 F.3d 138 (2d Cir. 2012).

30.  The Debtors may not assume the TriNet Agreements, and TriNet may not be compelled to perform pursuant to the TriNet Agreements.

31.  TriNet does not intend to process future payroll for the Debtors because it has no obligation to do so, and cannot be compelled to do so under the terminated TriNet Agreements.

### B. Debtors Are Obligated to Reimburse TriNet the Shortfall Associated With the Final Payroll.

32.  In connection with processing its final payroll on behalf of the Debtors, on April 14, 2017, TriNet paid out more funds to Debtors' employees than Debtors had advanced to TriNet pre-petition.

33.  Therefore, any authority granted to the Debtors in connection with the Wage Motion must include the authority to reimburse TriNet the $37,034.64 shortfall.

6

34. In the alternative, TriNet reserves all rights to seek reimbursement of the $37,034.64 employee payment shortfall as an administrative expense of the estate, or otherwise. *See* 11 U.S.C. § 503(b)(1)(A) (authorizing an entity to request payment as an administrative expense, "the actual, necessary costs and expenses of preserving the estate ….")

## IV.    CONCLUSION

35. TriNet has no objection to the Debtors' request for a grant of authority to pay its employees pre-petition wages. However, for the reasons set forth above, TriNet respectfully requests that the Court deny the Wage Motion to the extent it seeks to require TriNet to perform under the terminated TriNet Agreements.

Dated: April 18, 2017  
       Huntington, New York

Respectfully submitted,

By:   /s/ Amish R. Doshi  
Amish R. Doshi, Esq.  
**MAGNOZZI & KYE, LLP**  
23 Green Street, Suite 302  
Huntington, New York 11743  
Telephone: (631) 923-2858  
Email:    adoshi@magnozzikye.com

Shawn M. Christianson, Esq. (CSB # 114707)  
Valerie Bantner Peo, Esq. (CSB # 260430)  
**BUCHALTER, A Professional Corporation**  
55 Second Street, 17th Floor  
San Francisco, California 94105-2130  
Telephone: (415) 227-0900

**Attorneys for TriNet Group, Inc.**