UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
In re                                                    :
                                                         :        Chapter 11
AGENT PROVOCATEUR, INC.,  et al.,                        :        Case No. 17-10987
                                                         :        Jointly Administered
                                                         :
                        Debtors.                         :
-------------------------------------------------------------x

---

**DECLARATION OF DEAN R. VOMERO IN SUPPORT OF THE MOTION FOR ORDER (I) APPROVING THE SALE OF THE DEBTORS' ASSETS; (II) APPROVING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND (III) GRANTING RELATED RELIEF**

---

I, Dean R. Vomero, make this Declaration pursuant to 28 U.S.C. § 1746 and state as follows:

       1.      I am a Managing Director with Applied Business Strategy, LLC ("**ABS**"), which was retained by Agent Provocateur, Inc. and Agent Provocateur LLC (each a "**Debtor**" and collectively, the "**Debtors**") prior to the filing of the above captioned bankruptcy cases (the "**Bankruptcy Cases**") to serve as the Debtors' financial advisor.  After the Debtors filed their Bankruptcy Cases, they sought to retain ABS as their financial advisor.  An order approving the Debtors' retention of ABS was entered by this Court on May 17, 2017 [D.E. 82].

       2.      The Debtors have filed a Motion for an Order (I) Approving the Sale of the Debtors' Assets; (II) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases and (III) Granting Related Relief [D.E. 99] (the "**Sale Motion**").  Through the Motion, the Debtors are asking this Court to, among other things, approve the sale of substantially all of the Debtors' assets to Agent Provocateur International (US) LLC (the "**Buyer**").

       3.      I am submitting this Declaration in support of the Sale Motion and to provide background information with respect to the Debtors' post-petition operations.  All of the facts set forth herein are based upon my personal knowledge, information supplied to me by persons involved in the operation of the Debtors' business or the administration of the Debtors' chapter 11 cases, and my review of relevant documents and records maintained in the ordinary course of the Debtors' business.  If I were called to testify, I could and would testify competently to the facts set forth herein.  Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Sale Motion or the proposed Asset Purchase Agreement attached to the Sale Motion.

       4.      As discussed in the Sale Motion, prior to the Petition Date the Debtors' business was rapidly deteriorating. The Debtors' parent, Agent Provocateur Limited n/k/a Pearl Group

1

Limited (the "**UK Parent**") had entered administration under the insolvency laws of the United Kingdom (the "**Administration**").   Immediately following the commencement of the UK Parent's Administration proceeding, the administrator completed a sale of the UK Parent's business and operating assets to a newly formed company, Agent Provocateur Limited, a wholly owned subsidiary of Four Marketing Limited ("**Four Marketing**").   Four Marketing is a high end fashion retailer based in the United Kingdom which operates a number of retail chains throughout the United Kingdom and Europe.

5.      The sale of the UK Parent's business to Four Marketing included all right, title and interest in assets of the UK Parent, including inventory (wherever located) and intellectual property (including the Agent Provocateur brand).

6.      Prior to the sale, the UK Parent had permitted the Debtors to use its intellectual property, including the Agent Provocateur trademarks and brand, in connection with their on-going operations.   In addition, the UK Parent had supplied the Debtors' stores with all of their inventory pursuant to an undocumented arrangement under which title remained with the UK Parent until the point of sale, at which time the Debtors would be charged the cost of the inventory that had been sold, such cost on average being approximately 20% of the retail sale price.

7.      Following the sale of the UK Parent's business to Four Marketing, the Debtors were left without a source of new inventory to replenish their shelves.   As a consequence, the Debtors' sales declined resulting in decreased liquidity and an inability to satisfy on-going obligations, including rental obligations owed to the landlords of the 21 stores leased by the Debtors in the United States.   As rental obligations became delinquent, a number of landlords commenced or threatened to commence, eviction proceedings or other actions to terminate the Debtors' leases.

8.      As a result of their deteriorating financial situation, and with no hope of reorganization, the Debtors started preparations to shut down their operations and file chapter 7 bankruptcy petitions.   Before such petitions were filed, however, Four Marketing expressed an interest in purchasing certain of the Debtors' operations.   As a result of Four Marketing's interest in pursuing a possible sale, the Debtors filed their voluntary petitions under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York (the "**Court**") on April 11, 2017.

## Negotiations with Four Marketing

9.      At the time they filed for relief, and for several weeks thereafter, the Debtors' forecasts suggested that the Debtors would face significant liquidity issues and would need financial assistance from Four Marketing to successfully operate through the anticipated closing date of a sale.   Four Marketing expressed a willingness to provide such assistance through a DIP financing agreement.

10.     In addition, the Debtors depended on Four Marketing for marketing, distribution, inventory replenishment and corporate services (including, human resources, accounting, payroll and information technology) that the Debtors' UK Parent had previously provided to the

Debtors.  Four Marketing expressed a willingness to provide such services and inventory, and indicated that the appropriate fee for such services during the post-petition period prior to the closing of a sale would be $40,000 per week, and the appropriate licensing fee for the Debtors' use of the Agent Provocateur trademark and brand in the operation of their business would be $115,000 per month.

11.    Four Marketing's initial offer for the twelve stores in which it had expressed an interest proposed a cash purchase price of $800,000 (later reduced to $700,000), less (i) the amount of any unpaid DIP loan outstanding at the closing of the sale, (ii) the weekly fee for corporate services described above, and (iii) the monthly trademark license fee.[1]

12.    In assessing the best path to follow for the benefit of the Debtors' estate, their creditors and other stakeholders, the Debtors first considered whether there was any viable alternative to the terms of sale being proposed by Four Marketing.  Consideration was given to the various assets owned by the Debtors and the recovery that might be realized from those assets through a liquidation, as opposed to the proposed sale to Four Marketing.  As discussed above, all of the inventory in the Debtors' stores is claimed to be owned by the Four Marketing subsidiary that acquired the assets of the Debtors' UK Parent.  It is my understanding, based upon discussions with counsel for the Debtors, that the ownership issue turns on whether the inventory was supplied by the UK Parent to the Debtors pursuant to a common law bailment or an Article 2 sale or return.  I am further advised by counsel for the Debtors that a strong argument can be made that the inventory arrangement was a common law bailment because the parties intended that title would remain with the UK Parent until the point of sale by the Debtors (as reflected on the UK Parent's books), the risk of loss with respect to the inventory remained with the UK parent until the point of sale, and the UK parent retained authority over disposition of the inventory, including setting the prices at which it could be sold.

13.    The Debtors also considered whether any value could be realized from a liquidation of the furniture, fixtures and equipment (the "**FF&E**") in its stores.  I reviewed detailed FF&E schedules prepared by the Debtors and performed various recovery analyses.  I shared these schedules with several liquidators who have experience in the disposition of such assets.[2]  Based upon their review of the schedules, and their experience with assets of this type, each of them was of the view, with which I concur, that the cost of removing the FF&E from the stores would exceed the amount that could be recovered, or produce a marginal recovery at best.

14.    Finally, the Debtors considered whether any of the leases proposed to be acquired by Four Marketing were "below market" such that they possibly could be marketed and sold to third parties through assumption and assignment under section 365 of the Bankruptcy Code in lieu of the proposed sale to Four Marketing.  The Debtors retained Jones Lang LaSalle, a real estate brokerage firm ("**JLL**") to evaluate the leases.  JLL identified two leases among those proposed to be assigned to Four Marketing that contained terms that were "below market." Based upon the JLL analysis, the sale of those leases potentially could produce a net recovery in

---

[1] Four Marketing's initial offer contemplated that the trademark license fees would be waived if it was the successful purchaser of the Debtors' assets.

[2] The liquidators with whom I consulted were Hilco Merchant Liquidators LLC, Onyx Asset Advisors LLC and Thompson Auctioneers.

the approximate range of $320,000, assuming a marketing period of between six and nine months.  In order to realize the foregoing estimated net recovery, the Debtors would be required, however, to pay rent in the amount of $121,124 per month during the marketing period which would have been a significant drain on their limited cash resources.  Moreover, any recovery realized by the estate from the sale of those leases would be diluted by the increase in the unsecured creditor claim pool if the other leases being assumed and assigned to Four Marketing were instead rejected.

15.    The Debtors further considered a sale of the Debtors' assets through a competitive bidding process.  It quickly became obvious, though, that a competitive bidding process would be ineffectual, resulting in no benefit in this situation. Without the Agent Provocateur inventory and intellectual property—for both of which the sole source is the Buyer—the Debtors have next to nothing and they cannot survive. Absent another buyer that saw such value in the leases in the twelve remaining retain locations to justify a purchase price in excess of the Purchase Price, there is no possibility of a more beneficial sale. And the possibility that such a buyer exists is so remote as to be virtually inconceivable.

16.    Just as significantly, not only would the process be futile, but it would also be time-consuming and costly and deplete limited estate resources. It has become more apparent than ever that the Buyer is the only party with the means and motivation to purchase the business.

17.    To that end, the Debtors negotiated for improvements in the terms of the APA. Notably, the Debtors' negotiations resulted in a significant increase in the cash consideration. The agreed-upon purchase price is $300,000 more than Four Marketing's initial offer, an increase of 37.5%.

18.    The Purchase Agreement, and the Debtors' entry into and performance under the Purchase Agreement, (i) constitute a sound and reasonable exercise of the Debtors' business judgment consistent with their fiduciary duties, (ii) provide value to and are beneficial to the Debtors' estates, and are in the best interests of the Debtors and their estates, creditors, and other parties in interest, and (iii) are reasonable and appropriate under the circumstances. Business justifications for the Sale Transaction include, without limitation, the following: (i) the Purchase Agreement constitutes the highest or otherwise best offer available for the Acquired Assets; (ii) the Purchase Agreement presents the best opportunity to maximize the value of the Acquired Assets and to avoid deterioration in the value of the Acquired Assets; (iii) unless the Sale Transaction and all of the other transactions contemplated by the Purchase Agreement are approved, recoveries to creditors may be materially diminished; and (iv) the value of the Debtors' estates will be maximized through the transactions effectuated pursuant to the Purchase Agreement.

19.    Based upon the foregoing analysis and having considered all available options under the circumstances, the Debtors have determined that a private sale to the Buyer will result in the greatest recovery.

4

## Debtors' Financial Performance from the Petition Date

20.    On the Petition Date, the Debtors operated 21 leased stores and eight licensed departments in department stores owned by Bloomingdale's and Saks Fifth Avenue, respectively.  In accordance with the interest expressed by Four Marketing to acquire ten leased stores and the licensed department in Bloomingdale's department store on 59th Street in New York City (the "**Continuing Stores**") the Debtors closed all of their other stores and licensed departments during the week of April 17, 2017.[3]  The Debtors have continued to operate the Continuing Stores since the Petition Date.

21.    A weekly cash flow schedule reflecting actual operations from the Petition Date through June 8, 2017 is attached hereto as Exhibit B.

## Accrued Professional Fees

22.    A schedule of accrued professional fees incurred on behalf of the Debtors since the Petition Date is attached hereto as Exhibit C.  No such fees have been paid as yet, and will be subject to the filing of appropriate fee applications and the entry of Court orders approving the payment of fees.

## Projected Recovery and Payments if the Proposed Sale is Consummated

23.    As finally negotiated, Section 2.5(a) of the proposed Asset Purchase Agreement (the "**APA**") provides that the Buyer will purchase substantially all of the Debtors' assets for $1,100,000 (the "**Purchase Price**").  This amount is subject to certain provisions that will either increase or decrease the total amount realized by the Debtors from the sale of its assets.  Each provision is discussed below:

a) <u>Deposit</u>.  Pursuant to Section 2.11 of the APA a deposit of $100,000 shall be held in escrow pending the closing of the sale.  If the sale occurs the deposit will be transferred to the Debtors at closing.

b) <u>DIP Financing Obligations</u>.  The Purchase Price will be reduced by the outstanding amount owed under such DIP Credit Agreement as may have been approved by the Court.  Based upon current projections, it has become apparent that DIP financing will not be required and thus no reduction in the Purchase Price will be made for this item.

c) <u>Postpetition Sales of Inventory</u>.  The Purchase Price will be reduced by accrued amounts owed to the Buyer's UK Affiliate from postpetition sales of inventory that was delivered to the Debtors after the Petition Date by the Buyer's UK Affiliate.  This accounts for the price of the inventory that the Buyer's UK Affiliate has shipped to the Debtors since the Petition Date, and is consistent with the debtors' historical practice of paying for the cost of inventory supplied by its Parent at the time the inventory is sold at retail.  The average cost of goods sold is approximately 20% of the retail sales price.  As noted above,

---

[3] One other store located at the Bal Harbour Shops in Miami, Florida has remained open although the lease was terminated by the landlord prior to the Petition Date.  Four Marketing is currently engaged in discussions with the Bal Harbour landlord regarding the future operation of that store.

delivery of this inventory to the Debtors has helped stabilize the Debtors business and has contributed to the Debtors' better than expected sales and cash flow over the past several weeks.    I expect the reduction in the Purchase Price as a result of this offset to be approximately $191,000.

d) <u>Corporate Service Charges</u>.  The Purchase Price will be reduced by charges for corporate services that the Buyer's UK Affiliate has provided to the Debtors.  These charges account for certain personnel, payroll, accounting, advertising, distribution and similar services that the Buyer's UK Affiliate provides to the Debtors that the Debtors would otherwise have to provide themselves.   These charges total $10,000 per week.  The maximum amount of the reduction is currently being negotiated but in no event will be greater than $120,000 and would be lower than that if the sale closes on or before June 23.

e) <u>Assumed Liabilities</u>.  The Purchase Price will be reduced by the amount of accrued Assumed Liabilities as of the closing date, with the exception of any Cure Amounts necessary to cure defaults and to pay all actual or pecuniary losses that have resulted from such defaults under the Assumed Contracts, including any amounts payable to any landlord under any Lease that is an Assumed Contract.  This is essentially a wash as the Buyer will be assuming certain post-petition liabilities that if not assumed would be paid from the sale proceeds.

f) <u>Closing Cash</u>.  The Purchase Price will be increased by (i) all cash located at any Continuing Store, and (ii) cash deposits of the Debtors held by any Person relating to Acquired Assets or securing chargebacks, credit card processing claims or similar claims. In addition, it should be noted that all cash generated by the Debtors, other than Closing Cash, is an Excluded Asset under the APA.  At the present time, my forecast indicates that the Closing Cash plus other residual cash generated by the Debtors through operations will be approximately $875,000 as of the closing.

g) <u>AMEX Security Retention Amount</u>.  The Purchase Price will be increased by any amount retained by American Express for security as of the closing date. I expect the increase in the Purchase Price as a result of the AMEX Security Retention Amount to be approximately $50,000.

24.    After all of the offsets contained in the APA are accounted for, I would expect that the Debtors will realize approximately $1,839,000 from the sale of their assets to the Buyer, inclusive of the residual cash generated from operations through closing.  Attached hereto as Exhibit A is a schedule showing the anticipated recovery for the estate from the sale of the Debtors' assets, and a projected recovery for the benefit of unsecured creditors.

25.    In addition to the Cash Purchase Price to be paid by the Buyer under the APA, the Buyer has agreed to cure prepetition delinquencies that exist with respect to the Assumed Contracts, including prepetition unpaid rent payments owed to landlords on account of the leases at the Continuing Stores.  I expect this cure amount to be approximately $702,007.  Payment of these claims will also reduce the total amount of outstanding unsecured claims, which will increase the total percentage recovery for the remaining unsecured creditors.

6

26.     If the sale is consummated, the Buyer has also agreed to release any and all claims it or its affiliates may have against the Debtors.

27.     Assuming the sale is consummated, and barring any unforeseen developments in this case, at this time my current forecast projects all professional and other administrative expense claims will be paid in full and there will be a modest recovery for the benefit of the holders of the unsecured claims.

28.     The sale will also benefit other stakeholders.  Many of the employees of the Debtors will continue to be employed.  Additionally, as a result of the assumption and assignment of the Assumed Contracts, obligations to the landlords of the Continuing Stores will continue to be performed, which will benefit them and the shopping centers or shopping districts in which the Continuing Stores are located.  None of these benefits would occur if the Debtors had pursued a chapter 7 liquidation.

29.     The Acquired Assets constitute property of the Debtors' estates, and good title thereto is vested in the Debtors' estates. The Debtors are the sole and rightful owners of the Acquired Assets, and no party, other than Four Marketing, has any ownership right, title, or interest therein.

30.     Further, the sale of the Purchased Assets free and clear of all liens, claims, and interests is appropriate here.  It is my understanding that section 363(f) of the Bankruptcy Code has been satisfied here because there are no known pre-petition secured creditors with liens on the Purchased Assets.  To the extent any creditor has a lien, claim or interest in the Acquired Assets, such lien, claim or interest will attach to the proceeds of the Sale.

31.     Ultimately, the transaction reflected in the APA was negotiated by the parties at arm's length and in good faith. While the Buyer is the only party capable of—and willing to— salvage the Debtors' remaining business operations, the Debtors and their professionals continued to negotiate for better terms, as set forth in the APA. The Debtors, Buyer, and each of their respective management, boards of directors, members, officers, directors, employees, agents, and representatives, acted in good faith.

32.     The Purchase Agreement, and each of the transactions contemplated therein, were negotiated, proposed, and entered into by the Debtors and Buyer in good faith, without collusion or fraud, and from arm's-length bargaining positions.  To my knowledge, neither the Debtors nor Buyer has engaged in any conduct that would cause or permit the Purchase Agreement to be avoided and/or costs and damages to be imposed. The Debtors were free to deal with any other party interested in buying or selling on behalf of the Debtors' estates some or all of the Acquired Assets. To my knowledge, Buyer has not acted in a collusive manner with any party and was not controlled by any agreement among bidders. Buyer's payment of amounts owing under the Purchase Agreement are in good faith and for valid business purposes and uses. To my knowledge, no common identity of incorporators, directors, or controlling stockholders exists between Buyer and the Debtors.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

Executed on June 10, 2017, at Cleveland, Ohio.

*/s/ Dean R. Vomero*
Dean R. Vomero

EXHIBIT "A"
RECOVERY FORECAST

| | Close Date 30-Jun |
|---|---|
| **Total Cash Sources** | |
| Sale proceeds | $ 1,100 |
| AMEX Security Retention - Ongoing | 50 |
| AMEX Security Retention - Received 6.7 | 125 |
| Forecast cash | 875 |
| **Total Cash Sources** | $ 2,150 |
| **APA Deductions** | |
| Corporate chargebacks | (120) |
| Inventory purchases | (191) |
| **Total APA Deductions** | ($311) |
| **Cash Available Before Administrative Expenses** | $ 1,839 |
| **Administrative and Accrued Expenses** | |
| Accrued post-petition rent | (188) |
| Professionals (includes wind down estimate) | (700) |
| Sales tax | (100) |
| Operating expenses (like utilities) | (100) |
| Rent - closed locations and Bal Harbour | (204) |
| **Total Administrative and Accrued Expenses** | ($1,293) |
| **Projected Recovery to Unsecured Creditors** | $ 547 |

EXHIBIT "B"

RECOVERY FORECAST

| Week Beginning----------> | 5 Days 12-Apr | 1 17-Apr | 2 24-Apr | 3 1-May | 4 8-May | 5 15-May | 6 22-May | 7 29-May | Through June, 8 | Total |
|---|---|---|---|---|---|---|---|---|---|---|
| Total Cash Sources (Cash Sales) | $ 79,326 | $ 183,388 | $ 165,227 | $ 133,128 | $ 231,969 | $ 170,423 | $ 233,164 | $ 450,274 | $ 307,348 | $ 1,954,247 |
| Total Cash Uses | ($19,191) | ($123,726) | ($50,303) | ($224,060) | ($530,218) | $23,961 | ($164,494) | ($195,096) | ($358,981) | ($1,642,108) |
| Rent | | | | | (258,337) | 0 | (57,179) | 0 | (294,851) | (610,367) |
| Payroll | | (119,991) | (41,526) | (217,764) | (244,481) | 42,919 | (51,568) | (150,623) | (19,502) | (802,536) |
| Sales tax | | (1,686) | (5,433) | | | (7,359) | (48,719) | (6,870) | 0 | (70,067) |
| Operating & admin exp | (19,191) | (2,049) | (3,344) | (6,296) | (27,400) | (11,599) | (7,028) | (37,603) | (44,628) | (159,138) |
| | | | | | | | | | | 0 |
| Net Cash Flow | $60,135 | $59,662 | $114,924 | ($90,932) | $(298,249) | $194,384 | $ 68,670 | $255,178 | ($51,633) | $312,139 |
| Beginning Cash | 572,653 | 632,788 | 692,450 | 807,374 | 716,442 | 418,193 | 612,577 | 681,247 | 936,425 | 572,653 |
| Ending Cash | $632,788 | $692,450 | $807,374 | $716,442 | $418,193 | 612,577 | 681,247 | 936,425 | 884,792 | 884,792 |

## Detail of Operating and Admin. Expense:

| Operating and Admin. Expense Detail | |
|---|---|
| Expense Type | Amount |
| Bank and Credit Card Fees | $ 40,713 |
| Delivery Charges | 14,983 |
| Utilities, Security and Sanitation | 23,827 |
| Maintenance & Other Operating | 13,431 |
| Rent Related (such as utilities or real estate tax) | 66,185 |
| Total Operating and Administrative Expenses | $ 159,138 |

EXHIBIT "C"

Estimated Accrued Professional Fees

| Professional | Estimated Costs through June 7 | Retainer Amount |
|---|---|---|
| THF | $ 392,000 | $ 247,000 |
| ABS | 145,000 | 10,000 |
| Burgess Salmon | 7,600 | 57,000 |
| Amanda Brooks | 27,000 | |
| Creditors Committee | | |
| **Total** | **$ 571,600** | **$ 314,000** |